24-2408, Western Missouri, Cloetta Brady v. Walmart Stores, et al. All right, Mr. Montgomery, we'll hear from you first. The issues that the district court decided were that a family to support, a comment that was made during the failure to promote Ms. Brady, that that comment was not direct evidence of sex discrimination under Title VII. The district court also decided that Ms. Brady had not made her prima facie case, and so she did not even get to the pretext sort of analysis of the McDonnell-Douglas burden-shifting framework. Just a few days ago, and we have provided a letter, a 28-J letter to the court and filed that, but just a few days ago, Justice Thomas entered a concurring opinion in the case Ames v. Ohio Department of Youth Services, and I just want to quote a few pieces of his concurring opinion, because I think it gets at some of the heart of what is going on here with our appeal. Justice Thomas, in this concurrence on June 5th of last week, he said, this court, the United States Supreme Court, has held that the McDonnell-Douglas framework should not be used in cases where the plaintiff argues that the employer operated with mixed motive. And he goes on to say that a plaintiff who cannot establish a prima facie case at the first step, or pretext at the third step, can still prevail under Title VII, so long as the evidence raises a reasonable inference of unlawful discrimination. The ultimate question is simply whether the defendant intentionally discriminated against the plaintiff. He kind of closes out his concurring opinion with this quote, which is, in the meantime, he's kind of describing this sort of McDonnell-Douglas sort of analysis that has been used in discrimination cases, and he says, in the meantime, litigants in lower courts are free to proceed without the McDonnell-Douglas framework. The court has never required anyone to use it, and district courts are well-equipped to resolve summary judgment motions without it. And so that really gets at the core of this appeal here, which is the district court below kind of put things in different boxes. First, the district court walked through the direct evidence analysis and Mr. Cornelison's statement to Ms. Brady when she asked him why wasn't I selected for the promotion. And the district court just analyzed Mr. Cornelison's statement under the direct evidence framework and not under the McDonnell-Douglas framework. And then whenever the district court got to the McDonnell-Douglas framework, the district court decided that Ms. Brady had not met her prima facie burden of showing that she applied and that she was qualified. And so what Justice Thomas's concurring opinion here in Ames is saying is that there's really just one question at the end of the day, and it's could a reasonable jury look at this evidence and look at this case altogether and decide that a violation of Title VII occurred. How could that happen in this case? For instance, the district court decided that what you were offering as direct evidence was not direct evidence, isn't that correct? Yes, Judge. If that's true, then what the district court is saying is that this evidence will not support an inference of a discriminatory intent, isn't that what it's saying? I'm sorry, let me finish. I'm sorry. So if that's true, how can it make a difference at the tail end, if you were, when you go through a prima facie case and the district court says you lose that and what you're saying is that, never mind, we still have enough evidence here to raise an inference of intent, isn't that the argument? So if it didn't matter in the front end, if it didn't raise an inference in the front end of discriminatory intent, how can it raise one at the end of the tail, at the end of the case? I don't understand why it's any better, if you see what I mean, at the end of, after all the evidence is in, than it was in the first place. And I'm trying to kind of understand, you know, how to answer this, but our appeal and the argument that we're making is that traditionally there's been more than one way that courts have analyzed a Title VII violation. Sometimes a court will look at it through the lens of direct evidence, and then if there is not direct evidence, then they move on to the The statement that Mr. Cornelison made to Ms. Brady, you're not being, Mr. Harms was selected because he has a family to support, it could be analyzed under direct evidence or McDonnell Douglas or some other way too. It could be a more holistic analysis of that evidence, and the district court didn't appear to do that with its order. It just analyzed Mr. Cornelison's statement. We got that point, but the question is, if it wasn't direct evidence, how does it help in some other way? Because it is evidence of pretext, and then Ms. Brady, combined with the other evidence of the case, namely that she was lied to whenever she said, hey, is this position going to be open? And Mr. Cornelison said, no, that position's not going to be open. Then he fills it with Mr. Harms, who's a man, and Mr. Harms was able to skip the interview process, and then he comes to her and says, well, I gave it to Mr. Harms because he has a family to support. Combined, that combination of evidence there, it is direct evidence, and a reasonable jury could look at that evidence and say, a violation of Title VII on an impermissible factor here, sex motivated it. Even if you're right that this concurrence carries the day, you still have to have some evidence from which an inference can arise of, in this case, sex discrimination. Where is that? I mean, just saying he has a family to support, that could be she has a family to support. I mean, that doesn't, to me, raise an inference of I want a man versus a woman. And this is where we get to sort of the case law that we've provided for the court, and this really stems from the Supreme Court's decision in Nevada, Department of Human Resources v. Hibbs, where the 2003 decision where the United States Supreme Court said, stereotypes about women's domestic roles are reinforced by parallel stereotypes, presuming that men have a lack of domestic responsibilities. In that case, and all the cases that have followed from it, from around the circuits, have said that whenever you interject this family issue into the workplace, it can arise in a lot of different ways. It can be saying a woman has children, so therefore she doesn't get the promotion. Or it could be saying we're going to give this promotion to a man because he has a family to support. And I think your Honor is exactly correct to pick up on she did have a family, and she testified about that in her deposition, that she had a family to support too. So why was it more important for Mr. Cornelison to get this promotion over her? He said he was sick as well. Yes. That may be an answer to your question. And so the answer to that is if he said that, and the testimony was both, that he said maybe he was sick and a family to support, but it was definitely a family to support. And if it was both, then it's a mixed motive. And so just because both are there doesn't mean that one of them isn't there. And so the family to support is still there. And if that was the reason for the promotion, which it was, and that's what the evidence says, then it's still an impermissible motive, even if it was just one of them. I wonder if it's two motives or just one. Sick and, in other words, sort of hyphenated. Sick and having family responsibilities. It's hard for me to know whether that's two or just one. Is that a jury question, I guess? Whether it is a mixed motive? Yes. So long as there's enough evidence to support that. Yes. So the statement that Ms. Brady testified to was that it was either that he said he had a family to support or that he was sick and had a family to support. But it wasn't an and or. So Ms. Brady was very clear in her testimony about that during her deposition that he said family to support. And if that analysis is there, if that motive is there in Mr. Cornelison's mind, even if it's one of two, it's still an impermissible motive under Title VII. What evidence was there that Cornelison knew that Ms. Brady had a family to support? There wasn't any. Doesn't that make the two people differently situated then? It does not. I can see your argument if the woman had a family and the man had a family and the defendant favors the man for stereotypical reasons about family support. But I thought you just said your client, there is no evidence that he knew she had a family to support. I don't know if there is any evidence that he asked for that question or that he knew that. But they are still similarly situated because they were both employees who worked at the same location. And if Mr. Cornelison wanted to ask Ms. Brady, do you have a family, that was not a factor in his mind. So him automatically assuming that Mr. Harms' family was more important than any family that Ms. Brady may have had is still an impermissible stereotypical sort of response that's impermissible. Wasn't it indisputable though that she wasn't qualified for the job? In other words, she hadn't passed the test or had the supervisory experience that Mr. Harms actually did? So that point was actually disputed. It was disputed at summary judgment. It was disputed here. And Ms. Brady, during her deposition, first question, one of the first questions she got was, did you go on to Walmart's system and apply for this position? And she said, yes, I did. I took the test that passed me for the support team manager position in 2006, which is the year before the position was opened. Walmart's documents say a different thing. But Ms. Brady's recollection of her passing this test and applying for it and even selecting it as an interest on Walmart's career preference system, she testified that that's what she remembered. And she saw that the position was open on Walmart's wire system, internal system. And so her testimony and the evidence below at least was contradicted materially that she did apply for it and she was qualified and that she took the test and she passed it. The record was also clear that she had been. The company's records are wrong when it shows that I didn't take this leadership assessment test? Ms. Brady did not affirmatively say that. She said, I remember taking it? She said, I remember taking the support team qualifying manager test on Walmart's system the year before the position was opened. But the record showed she had not taken it. Correct. It was disputed. You think that creates a genuine dispute? Yes. That the records were wrong? Yes, and especially given that the records were wrong in other places too. So Walmart's records said that they interviewed Mr. Harms and whenever we deposed Mr. Harms in the case, he affirmatively said that he literally never had to interview for any position at the store, especially this support team manager position. Does she say she applied outside the computer system? Expressed an interest? Just expressing her oral interest to Mr. Cornelius. I'm sorry, go ahead. Whenever she went to him a few weeks before the position was filled, she said, hey, I see that this position is going to be open. And he said, no, I'm not going to fill it. And she said, if it comes open again, will you consider me? Not a formal type of application. So other than her application on the computer system, no real other formal application. But then it's also important to remember that that's how Walmart does all of its hiring and promotions is through that system. So there's not really a –  So you're saying that oral-verbal interaction counted as an application for McDonnell-Douglas purposes? Yes, Judge. I would just respectfully like to reserve the rest of my time for rebuttal. You may. Mr. Rojas, we'll hear from you. Thank you, Your Honors. May it please the Court. My name is Robert Rojas, and I represent the defendants Walmart Incorporated and Walmart Stores Incorporated. As a preliminary matter, I'd like to address just a few misstatements or misrepresentations that were made on appeal, specifically either in the briefing or during counsel's oral argument. And also address the issue presented to the Court last night in the Rule 28J letter concerning Justice Thomas's concurrence in last week's decision in Ames v. Ohio Department of Youth Services. I think it's important to note that in Ames v. Ohio Department of Youth Services, the Supreme Court was rejecting the background circumstances rule that some courts have used for reverse discrimination claims, an issue that's not before this Court. Now, Ms. Brady has cited to Justice Thomas's concurrence wherein he remarked that he would question whether McDonnell-Douglas was appropriate for resolving Title VII claims. That issue was not before the Court. Rather, in his concurrence, Mr. Thomas noted that if it came upon the right issue. The Supreme Court has never instructed lower courts not to use McDonnell-Douglas. This Court has consistently affirmed the use of McDonnell-Douglas. Before last night, there was no argument as to whether the use of McDonnell-Douglas was appropriate or the District Court somehow erred in using it, which I do not believe they did. But I think the greater issue here, Your Honors, is that the ultimate question is and has always been, and I believe that counsel pointed this out, whether there is a genuine issue of material fact as to whether the employer engaged in intentional discrimination. And in that sense, we can use McDonnell-Douglas to see that when we get to that ultimate question, it does not exist there. One of the things that Ms. Brady has testified about is the interview process and the process by which an individual becomes qualified or applies for these roles. She states unequivocally in her briefing that she took the test, the supervisory leadership assessment, in 2006. But this, again, is a misrepresentation that she took and passed any Walmart management exams in 2006. There is no dispute that on August 18, 2006, Ms. Brady attempted to list support manager as an interest, but the career preference system rejected her as unqualified because she had not taken the required assessment. With respect to her actual testimony, if we look at this, we can see it in the appendix on pages 680 and, I believe, 684. She never specifically testified affirmatively that she took it in 2006. Rather, she testified it was either 6 or 7 that I took the test and passed it, and then went on to say, I believe it was in 2007. I'm not sure that I ever got in there to pass the test until maybe 2007. And on the issue of Walmart's records, they don't contradict Ms. Brady's testimony. At no time has she ever affirmatively stated that they're wrong. In fact, we can see that Walmart's records are consistent with Ms. Brady's recollection that she took no assessment until 2007. However, the important thing to note is that there is the supervisor leadership assessment that was required for the role, the SLA, and then there was another assessment, a TLA, which was required for salaried management roles that was not at issue here with the support manager role. The test that she took in 2007, according to her testimony and according to the records, is the TLA, which is irrelevant and inapplicable to the position. She didn't take and pass the SLA, the assessment that's actually required for the role at issue, until July 30, 2008, more than a year after the position was filled. So at that point, she was not qualified for the role. Similarly, any statements about the records or testimony being inconsistent on when the alleged sole comparator, Mr. Harms, took the assessment don't contradict one another. I think it's important to point that with respect to the testimony and the depositions which were taken in 2023, the individuals testified they didn't recall specifically the interview process, specifically Mr. Wallace, the individual who was the hiring manager, and Mr. Harms himself. These depositions were taken 16 years after the positions at issue. The fact that Mr. Wallace couldn't identify specifically who he interviewed does not contradict Wal-Mart's records 16 years prior that he did in fact interview three individuals, including Mr. Harms. He did note in his deposition that he wouldn't have been able to move forward had he not interviewed the three candidates. And the records show that Harms was one of those candidates. Moving to the specific statement about statute of limitations issue in this case. Your Honor, in this case there is not respectfully. This was kind of from its inception from Dukes versus Wal-Mart, a case that originated in the 1990s regarding a nationwide class of female. And so there was a tolling of the statute of limitations after the decertification. So it was a tolling situation? Yes, Your Honor. All right, go ahead. What about the family to support comment? Correct, Your Honor. I think one important thing to note on the family to support remark is, first and foremost, it's not direct evidence of gender discrimination. Why not? Can you elaborate on that? Because we have the Desert Palace case held that it was. There's some other cases cited that seem to be similar. Why doesn't the comment support an inference of stereotypical preference for males over females? Yes, Your Honor. Well, if we look specifically at the, if we start with the comment at issue, and I think it's important to clarify that Ms. Brady admitted as uncontroverted in response to Wal-Mart's motion for summary judgment, that Mr. Cornelius had told her, quote, Harms was selected because he was sick and he had a family to support. So any attempt to mischaracterize that now as a credibility issue, whether it's sick or family, is simply not supported by the record. So you think the case turns on whether he was also sick? I think that goes to show that there's an inference that the sickness actually was part of the reason why he was moved. And if we look specifically to the ultimate issue, Mr. Harms had actually been working in the support manager role since 1999. He had been in that role for nearly seven years. This wasn't a promotion. But beyond that, in 2006, under a prior store manager, Lou Amato, Mr. Harms was placed in the daytime support manager role from the overnight role as a medical accommodation because he was sick. So when the actual daytime support manager role became open in 2007, and he applied for it in career preference and he was interviewed for it, they moved him into the role. That is, Your Honor, I believe the most reasonable, and I believe what the district court looked at, inference that you would see. It's not related to the summary judgment. It isn't a question of what's the most reasonable inference. It's a question of whether there's a reasonable inference available for the plaintiff's position. So what do you say about this comment that he was given the job because he's got a family to support? Yes, Your Honor. So if we look at it under the direct evidence analysis, I think one of the things we can look at is the direct evidence analysis is not concerned with inferences. And that's specifically, Your Honor, because direct evidence, and this assumes that Mr. Corneliusson is the decision maker. Walmart maintains he wasn't. But if we assume that he was a decision maker, direct evidence, the statement must reveal a specific link between the alleged discriminatory animus and the challenge decision. It must be strong and clearly point to an illegal motive. And that's from this court's precedent in Ebersole v. Novo Nordisk. Statements that are facially and contextually neutral as to the alleged basis of discrimination are not direct evidence of discrimination. And I think more importantly, as this court stated in Erickson v. Farmland Industries, comments that require an inference to get to the conclusion that there could be an illegal motive or bias cannot be direct evidence of discrimination. And so if we're talking about inferences, one plausible inference, Your Honor, if we want to look at it and say one plausible inference is because he was sick and he had a family support, so because of his illness we're looking at it. Or another inference is opposing counsel would suggest that it's merely because of her gender. Well, if we look at those as inferences, we can see that direct evidence analysis would not apply. We would move on to the circumstantial evidence analysis. Because again, comments that require inferences to reach the conclusion are not direct evidence. They have to be strong and clearly to the point. Well, it seems to me you're implying that if there's direct evidence, it's really a summary judgment case, as long as it's believed. It seems to me you're implying that if there's something called direct evidence, that that requires a summary judgment case in favor of the plaintiff. Because you don't have to draw any inferences. It's just plain on its face. I don't think that's the law. I don't think that's the law. I understand the language that we've had in our previous cases. But any evidence requires an inference. Yes, Your Honor. I apologize if I misspoke. If there were, in any given case, direct evidence of discrimination by a statement, then the plaintiff would not be required to go through the McDonnell-Douglas analysis. And it would be enough to go to a jury trial for a credibility issue, Your Honor. But Your Honor, we respectfully maintain that's not what the situation is here. You're making this argument that because there's an inference required to determine that the statement indicates a stereotypical bias in favor of men, that it's not direct evidence. But it's still evidence. So why isn't it sufficient evidence to create a genuine issue of fact for trial on whether the decision maker was motivated by some stereotypical view of the gender roles? Absolutely, Your Honor. And with respect to that, I think if we want to look at whether or not it's inference, we would look at it under the pretext analysis, under McDonnell-Douglas. And so if we move to that, under the McDonnell-Douglas standard, we can see that not only did the district court properly find that she did not provide direct evidence of discrimination, but she also failed to provide circumstantial evidence. First, in that she failed to establish a prima facie case of sex discrimination. That required her to show that not only was she a member of a protected group, but that she applied for the position, she was qualified for it, was not hired, and a similarly situated individual outside the protected class had been promoted over her. And if we look at the facts here, we see that in 2006, Walmart instituted career preference, which was an automated system used in hiring and promotions. Under that system, associates like Ms. Brady could go in and mark positions as either interests or goals. A goal is a position someone might be interested in applying for for the future, whereas an interest was actually the functional equivalent of an application. But in 2006, Walmart also instituted assessments. And as I mentioned earlier, there's a supervisory leadership assessment and a tactical leadership assessment. What is at issue here is the SLA, the supervisory leadership assessment. Any associates who are not current hourly supervisors had to pass the SLA in order to be eligible and qualified to even apply for the role. Ms. Brady testified that she understood she needed to go into career preference. She understood she needed to pass a test to be qualified. And again, in 2006, she went in and attempted to list support managers and interests, but because she didn't take the SLA, she was rejected by the automated system as unqualified. Now, a year later, on June 18th of 2007, the hiring manager, Henry Wallace, opened a requisition for the daytime support manager role, and that's the role that is at issue here. But again, because Ms. Brady had not taken the SLA by that time, she was ineligible for the position and couldn't apply for it. So because she never applied for the position, was never qualified to apply for it, she can't establish a prima facie case of discrimination, Your Honors. Well, what about her statement that she did take the test? Yes, Your Honors. She is represented in the briefing in an oral argument that she took a test in 2006, but if we look specifically at her deposition testimony, it's uncontroverted that she testified that while she sought to set her interest for the support manager role, just go in and set an interest and attempt to apply, she testified she did not think she took the test until 2007. And that's why, as I mentioned earlier, Walmart's records are consistent that she took no test until 2007. Now, the test in 2007 that she took was the inapplicable tactical leadership assessment that was only to be applied or required for salaried management positions. The hourly supervisor support manager role was not a salaried management position. So Walmart's records are clear, and there's no dispute about this, that she had to go in and take and pass the supervisory leadership assessment. And I think even beyond that, so to some extent that argument is a red herring, but even if you wanted to conflate or compare the tactical leadership assessment with the supervisory leadership assessment, the position at issue was filled in July of 2007. She did not go in and take the tactical leadership assessment, which she claims qualified her for the role even though it's inapplicable. She didn't go in and take that and pass it for over a month after the role at issue was filled. So her testimony is consistent, Your Honors, that she didn't go in and pass any tests until 2007, but the test she is talking about is inapplicable. And Your Honors, it is also not only inapplicable, but it has nothing to do with the support manager role at issue, and it was taken after the fact, after the support manager role was at issue. Your Honors, I see I'm running out of time, but I think the main thing here, and again, if we look at the ultimate question of fact, whether a reasonable fact finder could find that there was intentional discrimination here, we see that there wasn't. Ms. Grady fails to offer direct evidence of discrimination. Cornelius's statement that he selected HARMS because, quote, he was sick and had a family to support is facially neutral and not direct evidence of discrimination. She likewise fails to offer circumstantial evidence of discrimination and cannot show that she was qualified or applied for the role or passed over for someone who was similarly situated. So for these reasons, we request the court affirm the circuit court's grant of summary judgment in favor of Walmart. Thank you. All right. Thank you for your argument. We'll hear rebuttal. Mr. Montgomery. Just on that last point, Walmart is representing here, and they have at the district court that there's no evidence that Ms. Grady applied for or took this test. And I just want to read from her deposition, which is in the record at page 812, the appellate record. And she was asked, this 72-question assessment, which is the SLA test that we're talking about, is required of any applicant who is not currently an hourly supervisor or a member of salaried management who applies for an hourly supervisor position, such as the support team role. And she answers yes. And then the question, is that what you're referring to in your interrogatory responses? Yes. I took the test on a computer. Yes. And then she's asked, and at that time, was the position open or were you just indicating it as an interest? That was just my interest in 2006. The evidence of this case is that in order to select interest to formally apply at Walmart and with its systems, you have to pass the test, then you can select interest. Ms. Grady testified in her depositions in the appellate record, page 812, that she selected it as her interest and she applied. She was also qualified in many other ways, as we've briefed. She had twice the years of experience at Walmart that Mr. Harms had. And importantly here, underneath this court's guidance and LIAC via Anheuser-Busch, the formal application process is lower for Ms. Grady. Whenever Walmart has some sort of secret backdoor methods of slating people into positions that they want to promote them into. And we can see that this case presents that very issue where Walmart's policies say that they have to interview three people, they have to select the most qualified candidate, and that Mr. Harms didn't have to interview at all. He testified affirmatively. He was just put in that position and switched to days. Mr. Wallace testified that Mr. Harms working this position on overnights, even if it was called the support team manager on overnights, that did not automatically qualify him. So for all these reasons, your honors, we respectfully request that the courts reverse the district court and to allow Ms. Grady to proceed to trial. And unless there's further questions, I will pass that. Very well. Thank you for your argument. Thank you to both counsel. The case is submitted and the court will file a decision in due course.